IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHANNON BOYCE,

    Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

    Defendant.

No. C 04-04028 WHA

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this social security appeal, the Court finds that the ALJ's conclusions were supported by substantial evidence and free of legal error. In addition, he allowed ample time for plaintiff to supplement the record with regard to her migraine headaches, such that her newly-proffered evidence does not compel a remand. Accordingly, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**.

## STATEMENT

**1.  PROCEDURAL HISTORY.**

On October 6, 2001, plaintiff Shannon Boyce completed an application for disability insurance benefits, alleging she was unable to work since October 7, 2000 (AR 69–72). Although the form was mailed in by her attorney, Brett Albren, her application was not officially filed until November 28, 2001, at which time the field office noted that plaintiff had

"left a number of questions unanswered" (AR 73–75, 104–07). In her disability report, plaintiff indicated that she had been involved in a car accident resulting in a head injury causing neurological damage, post concussion syndrome, post traumatic memory dysfunction, and knee injury (AR 95).[1] Her application was denied both initially (AR 32, 36–39) and upon reconsideration (AR 33, 41–44). An administrative hearing was timely requested by plaintiff's second attorney, W. Frederick Uehlein (AR 47).

On June 3, 2003, plaintiff had a hearing before ALJ Donald F. Rector, during which she was represented by a third attorney, Patrick J. Kelly (AR 276–311).[2] The ALJ rendered a decision on August 8, 2003, finding that plaintiff was not disabled (AR 14–26). Plaintiff requested administrative review (AR 13). In support of her appeal, plaintiff's fourth representative, Brian M. Epstein, wrote a letter arguing that the ALJ reached inconsistent conclusions (AR 272–75). The Appeals Council denied the request (AR 9–11). Plaintiff requested (and received) a brief extension of time to file a civil action (AR 7–8). Currently represented by a fifth attorney, Barbara Mann, plaintiff filed an action before this Court on September 22, 2004, seeking judicial review pursuant to 42 U.S.C. 405(g). The parties now make cross-motions for summary judgment.

### 2. TESTIMONY AT THE ADMINISTRATIVE HEARING.

At the hearing before the ALJ, plaintiff's attorney, Mr. Kelly, first entered additional medical opinions into the record (AR 281–83). Plaintiff was born on September 28, 1959; she was 43 years old at the time of the hearing (AR 284). She testified that she had earned a bachelor's degree in Business Administration, with a minor in Economics (*ibid.*). Her most recent job title was Manager III (*i.e.*, office manager) at the Department of Motor Vehicles in

---

[1] Post concussion syndrome is a common but controversial disorder that encompasses a variety of symptoms including headache, dizziness, fatigue, irritability, personality changes, and problems with concentration, recent memory or abstract thinking. *See e.g.*, http://neurology.health-cares.net/post-concussion-syndrome.php. Plaintiff claimed to suffer from headaches, chronic insomnia and cognitive insufficiency (AR 95).

[2] Mr. Kelly is apparently one of Mr. Uehlein's associates, but filed a separate representative appointment form (see AR 278).

Corte Madera, California, but she also worked on a project in Sacramento (AR 92–93, 286). Plaintiff agreed that her past relevant work history was accurately summarized in the record, except her work as a fire lookout had been seasonal (AR 96, 108–15, 141, 287).

Plaintiff had a fairly clear memory of her car accident and was able to describe it in some detail (AR 299–302). She testified that she temporarily experienced problems operating machines (*i.e.*, her cell phone, fax machine and microwave oven), but that only lasted for several months (AR 302–03). Oddly, she never stopped driving even when advised to quit (AR 303).

When asked why she was unable to work anymore, plaintiff described being unable to complete tasks because she had difficulty focusing (AR 290–91). She also complained that her medication helped her concentration, but was making her feel physically ill (AR 291, 293). Plaintiff had apparently tried to return to work both immediately after her car accident in October 2000 and several times since then, but was unsuccessful on each occasion (AR 285, 288). In fact, plaintiff's job was still "waiting" for her; her leave of absence was scheduled to expire a month after the hearing (AR 285, 292).

Above all, plaintiff indicated that her headaches were "a major concern" (AR 287). She had allegedly been suffering from severe migraines since her accident (AR 288, 294). When pressed, plaintiff indicated that this prevented her from being able to do any full-time job, "unless there's something that's very flexible, where they can work with me not being there certain days" (AR 294). Plaintiff testified that she was taking Imitrex for migraines and had previously been prescribed Celebrex for her knee, but otherwise her drug treatments had been "concentrating on the memory [problems], most of all" (AR 294–95).

Because counsel requested additional time to submit a narrative report from plaintiff's neurologist, Dr. J. Richard Mendius, the ALJ left the record open for thirty days after the hearing (AR 295–96). Vocational expert Dr. Gerald Belchick was also present at the hearing, but did not testify. As the ALJ had not yet determined plaintiff's residual functional capacity and had no hypotheticals to pose, he declined to hear any testimony from the VE (AR 309).

3

### 3. MEDICAL EVIDENCE.

The medical evidence was summarized in the ALJ's decision (AR 19–24). The administrative record contains medical records from Marin General Hospital, Eureka General Hospital, Mad River Community Hospital, North Bay Neurology and Southern Humboldt Jerold Phelps Community Hospital, as well as evaluations by plaintiff's treating physicians and state agency medical consultants (AR 142–250). This order will briefly review both plaintiff's self-reported symptoms and the findings of physicians who examined her.[3]

In an undated daily activities questionnaire, plaintiff offered somewhat contradictory responses with respect to her ability to take care of her daily needs (AR 116–22).[4] Plaintiff indicated that she spent the majority of her day watching TV, playing with her cats and "attempt[ing] to organise [sic] something" (AR 116). She lived alone and was able to do all her cooking, shopping and other chores without assistance; she also enjoyed gardening (AR 118). Yet, she also indicated that she had severe headaches and had difficulty concentrating, finishing tasks appropriately or communicating effectively (AR 120–21).

Plaintiff's mother, Connie L. Parker, submitted a third party questionnaire dated June 13, 2002 (AR 123–28).[5] She corroborated plaintiff's reports that she needed no assistance with personal grooming, chores or shopping (AR 124). She also confirmed that plaintiff enjoyed gardening and taking care of her three cats. She also noted that plaintiff had difficulty concentrating for any extended period of time (AR 127).

---

[3] Plaintiff indicated in her reconsideration disability report, submitted on March 21, 2002, that her "knee [was] no longer an issue but mental difficulties remain" (AR 129). Accordingly, this order will not focus on the medical records concerning her knee surgery although these were summarized by the ALJ (AR 19–20).

[4] Several typewritten answers, which indicated that she needed almost no help at all, were crossed out and replaced with handwritten responses suggesting her symptoms were more severe.

[5] Third-party testimony about a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly gives reasons for disregarding such testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). Here, while the ALJ failed to explicitly mention the questionnaire submitted by plaintiff's mother, there is no indication that he did not consider it. Indeed, plaintiff did not raise this point for court review. Regardless, the ALJ's ultimate determination of plaintiff's residual functional capacity was consistent with the fact that she needed no assistance with daily activities and claimed to have difficulty concentrating.

4

Hospital records reveal that plaintiff checked into Southern Humboldt Jerold Phelps Community Hospital on October 7, 2000 (the day of her accident), but an MRI revealed no fractures (AR 248). The next day, plaintiff went to Eureka General Hospital, where she complained that she had received little medical care at the other hospital (AR 157). Plaintiff received treatment for her scalp laceration and was instructed to return for follow up examinations (AR 156–59). She returned on October 10, and again on October 13; both times she was discharged in "good" condition (AR 152–55). A CT scan of her brain, conducted on October 10, 2000, was normal (AR 151).

Plaintiff's neurologist was Dr. J. Richard Mendius. An EEG showed normal results on January 30, 2001 (AR 168). Plaintiff had two MRIs with normal results on January 19, 2001, and February 15, 2002 (AR 245, 247). Progress notes, dated November 2, 2000, through August 14, 2001, reflected the fact that plaintiff complained of decreased concentration, trouble sleeping and difficulty with technology, (*i.e.*, rebuilding her computer or resetting her digital watch), but she never reported headaches (AR 169–72). Dr. Mendius stressed that plaintiff was not depressed but would likely benefit from cognitive rehabilitation (AR 169). In later notes, dated December 13, 2001, until July 9, 2002, Dr. Mendius also noted that plaintiff had difficulty with complex tasks and memory problems, such that she couldn't perform her regular job (AR 231–32, 244, 246). Headaches were not mentioned. Indeed, the first indication that she suffered from migraines in his progress notes was dated May 15, 2003 (AR 243).

On June 25, 2003, Dr. Mendius submitted a letter indicating that plaintiff's symptoms were "consistent with post concussive syndrome and migraine" (AR 250).[6] He indicated that plaintiff was being treated with "medications to reduce the frequency and severity of headaches, as well as help control the insomnia a [sic] mood issues related to concussion" (*ibid.*). Dr. Mendius suggested the following employment restrictions: "[l]imited interpersonal contacts; [d]uties that require high level reading and writing skills and critical

---

[6] This was the letter added to the file after the administrative hearing.

5

thinking/application of information and simple tasking as opposed to multi-tasking" (*ibid.*). It is worth noting that Dr. Mendius did *not* indicate that plaintiff was unable to work at all.

By referral from Dr. Mendius, Dr. Paul Maurice Peloquin conducted a psychological evaluation on April 20, 2001 (AR 160–65). He noted a variety of symptoms reported by plaintiff (AR 161). Dr. Peloquin noted that plaintiff had above average intelligence and tested within normal limits in most tasks, including those testing attention or concentration (AR 161–62). The overarching pattern to her test results was an ability to perform simple tasks, but "as she confronts complexity and abstraction, her abilities to cope with the requirements of complex integration of mental functions breaks down" (AR 163). He felt that plaintiff was not "able to return to work at this time due to her level of impairment," particularly because she was unable to deal with complexity and also became "emotionally overwhelmed by her cognitive inefficiencies" (AR 164). Dr. Peloquin did not comment on plaintiff's ability to do work other than her old job at the DMV.

On February 11, 2002, plaintiff was evaluated by Dr. Ranald Bruce (AR 182–84). Although he noted that plaintiff complained of various problems experienced since her head injury, he did not observe any of these symptoms during the interview or testing (AR 183). He concluded that plaintiff was likely capable of carrying out both simple and complex instructions (*ibid.*). Dr. Bruce also believed that plaintiff would have no problems cooperating with coworkers or with concentration, persistence and pace in an average work setting (*ibid.*).

On February 12, 2002, a comprehensive internal medicine evaluation was also conducted by Dr. Eugene McMillan (AR 185–86). Dr. McMillan noted that plaintiff had no gait abnormalities; she was also able to walk around as well as get on and off the examination table without assistance (AR 185). She also had a normal range of motion at all joints (AR 186). In short, he concluded that she had no physical limitations with seeing, hearing, speaking, lifting, sitting or walking (*ibid.*). With regard to her mental abilities, however, he observed that plaintiff had problems with retaining written material, organization, short-term memory and mathematical calculations (*ibid.*).

6

On November 13, 2002, Dr. Edgar O. Angelone performed another neuropsychological consultation (AR 237–41). Plaintiff reported having problems primarily with attention and concentration, particularly multi-tasking (AR 237–38). She also complained of memory problems and headaches, but denied suffering from depression and had no symptoms of post-traumatic stress disorder (AR 238). When tested, plaintiff did well except for "a much more complex task of divided attention" and certain memory tasks (AR 239–40). Dr. Angelone summarized her overall results as "within the normal range," with "some minor difficulties in the areas of processing of information, as well as strength in the right upper extremity, and on [a] serial learning task" (AR 240). He anticipated that plaintiff would be fine, as "the patient stands to improve with time" (*ibid.*).

Finally, the administrative record also contained state agency reports covering the period from December 6, 2001, to July 8, 2002 (AR 188–230). On February 20, 2002, Dr. Richard Trapnell indicated that plaintiff suffered from no medically determinable psychiatric impairment (AR 190). Dr. Yew Yee Wong, who also examined plaintiff on February 20, 2002, agreed with this assessment (AR 204). On March 4, 2002, Dr. Lola Lee Van Compernolle found plaintiff's claimed physical impairments non-severe (AR 218). Plaintiff's case file specifically included a notation that she tested "basically normal in all areas with no psych[ological] problems, depression or memory problems noted or discovered in her mental exam" (AR 219).

## ANALYSIS

**1.    LEGAL STANDARD.**

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). This is an extremely deferential standard. Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). This means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid.* The Court must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." *Andrews*, 53 F.3d at 1039.

Yet, "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities;" thus, where the evidence is susceptible to more than one rational interpretation, the decision of the ALJ must be upheld. *Ibid.*

The claimant has the burden of proving disability. *Id.* at 1040. Disability claims are evaluated using a five-step inquiry. 20 C.F.R. 404.1520. In the first four steps, the ALJ must determine: (i) whether the claimant is working, (ii) the medical severity and duration of the claimant's impairment, (iii) whether the disability meets any of those listed in Appendix 1, Subpart P, Regulations No. 4, and (iv) whether the claimant is capable of performing his or her previous job; step five involves a determination of whether the claimant is capable of making an adjustment to other work. 20 C.F.R. 404.1520(a)(4)(i)–(v). In step five, "the burden shifts to the Secretary to show that the claimant can engage in other types of substantial gainful work that exists in the national economy." *Andrews*, 53 F.3d at 1040.

The use of the Medical-Vocation Guidelines ("the grids"), at step five is proper where the claimant can "perform the *full* range of jobs in a given category." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999)(emphasis in original). Although "the fact that a non-exertional limitation is alleged does not automatically preclude application of the grids," the ALJ must first determine whether the "claimant's non-exertional limitations significantly limit the range of work permitted by [her] exertional limitations." *Id.* at 1102.

### 2. THE ALJ'S FIVE-STEP ANALYSIS.

In his decision, the ALJ found at step one of the sequential evaluation process that plaintiff' earnings in the amount of $9,280.66 during 2001 represented payments from her long term disability program rather than earnings from actual work; thus, she had not engaged in any substantial gainful activity since her alleged disability onset date (AR 19). At steps two and three, the ALJ found that plaintiff suffered from post concussion syndrome, which was medically severe, but did not meet or equal any listed impairment (AR 19–20). Since the record demonstrated that plaintiff's knee had completely healed since her surgery (*i.e.*, she had regained a normal range of motion), the ALJ found that this injury was not severe (AR 20).

8

The ALJ went on to determine that plaintiff had the residual functional capacity to perform at all exertional levels, but could only perform "simple, not complex, tasks" (AR 24). He also noted that even if he gave "maximum weight to her subjective allegations," plaintiff would still be capable of doing at least sedentary work (*ibid.*).[7] At step four, the ALJ relied upon the vocational expert's opinion to find that plaintiff could not do her past relevant work (*ibid.*).[8] At step five, the ALJ considered plaintiff's age, education and past work experience in light of Medical-Vocational Rule 204.00 of the grids. Despite the fact that plaintiff was only capable of performing simple tasks (*i.e.*, unskilled work) at any particular exertional level, the ALJ concluded that there were a significant number of jobs in the national economy that she could perform (AR 24–25).[9] Accordingly, he found that plaintiff was not disabled at any time through the date of his decision (AR 26).

Plaintiff now argues that (1) the case should be remanded so the ALJ may consider new and material evidence; (2) the ALJ erred in failing to consider all of her impairments; (3) the ALJ erred in discrediting her testimony; and (4) the ALJ failed to sufficiently develop the record with respect to her migraine headaches. The Court is not persuaded.

### 3. PLAINTIFF'S NEW EVIDENCE DOES NOT COMPEL A REMAND.

With her summary judgment motion, plaintiff submitted a more recent letter from Dr. Mendius, dated April 29, 2005. This letter describes plaintiff's migraine headaches in

---

[7] While the ALJ's opinion may have been somewhat unclear as to whether he determined plaintiff to be capable of (1) only sedentary work or (2) work at any exertional level, this point was not raised in the briefs. It is unclear whether there is substantial evidence in the record to support a finding that plaintiff was limited to sedentary work, as all the medical opinions suggested plaintiff's *physical* impairments were non-severe and had no impact on her capabilities. The Court declines to reach this issue. In any case, this order notes that the ALJ would have reached the same conclusion of "not disabled" even if he had relied upon Medical-Vocational Rule 201.27 in lieu of Rule 204.00.

[8] Although the ALJ indicated that he relied upon the VE's *testimony*, the VE did not testify at the hearing. Nonetheless, the VE did submit a written summary of plaintiff's past relevant work, all of which had been performed at a semi-skilled level or higher (AR 141). The Court assumes that this was the basis of the ALJ's conclusion at step four.

[9] Although the ALJ suggested that plaintiff may have mild difficulties in maintaining concentration, persistence or pace, this was apparently not part of his determination of her residual functional capacity (AR 24). Moreover, given the multitude of occupations at all exertional levels, any erosion would likely be minimal. Plaintiff did not raise this point for court review, but this order finds that the ALJ did not err in relying upon the grids despite this non-exertional limitation.

1  greater detail and lists the medications currently prescribed (4/29/05 Letter at 1). Dr. Mendius
2  indicated that plaintiff returned to the DMV to work four hours per day in September 2003
3  (*ibid.*). He also indicated that plaintiff continued to suffer from cognitive deficiencies,
4  concentration difficulties and an inability to finish tasks (*id.* at 2). It was his opinion that
5  "[o]utside of this unusual part-time job with the DMV which appears to be set up as loyalty for
6  past work, I do not feel that there is any type of work Ms. Boyce can do reliably due to her
7  severe and persistent migraine headaches" (*ibid.*). He also felt that she could not "persist at
8  simple tasks for two hours at a time" and was "unlikely to work well in a setting which requires
9  social interaction of even a limited nature" (*ibid.*). Plaintiff argues that this new evidence
10 compels a remand of her case to the Commissioner. The Court disagrees.

11       A claimant seeking remand on the basis of new evidence must demonstrate both that the
12 evidence is "material and that there is good cause for the failure to incorporate such evidence
13 into the record in a prior proceeding." 42 U.S.C. 405(g). To be material, the evidence must
14 bear directly on the matter in dispute and have a reasonable probability of changing the outcome
15 of the administrative hearing. *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001). "A
16 claimant does not meet the good cause requirement by merely obtaining a more favorable report
17 once his or her claim has been denied." *Ibid.* Good cause means that the new evidence was
18 unavailable earlier. *Compare Wainwright v. Secretary of Health and Human Services*, 939 F.2d
19 680, 683 (9th Cir. 1991)(noting that "[n]ew medical evidence that becomes available due to
20 improvements in technology meets the good cause standard"). A claimant must also establish
21 good cause for not soliciting the information earlier. *Key v. Heckler*, 754 F.2d 1545, 1551 (9th
22 Cir. 1985).

23       Here, the ALJ left the record open for 30 days after the hearing to accommodate
24 counsel's request to submit a report by Dr. Mendius. As discussed above, his letter noted that
25 plaintiff suffered from "post concussive syndrome and migraine," but did not indicate that she
26 was unable to work as a result (AR 250). Now that an unfavorable decision has been rendered,
27 plaintiff cannot have a second bite at the proverbial apple.

28

10

In his earlier report, Dr. Mendius focused primarily on the cognitive insufficiencies (*ibid.*). There was no suggestion that plaintiff's headaches restricted her ability to work in any way, particularly as she was being treated with "medications to reduce [their] frequency and severity" (*ibid.*). That Dr. Mendius later wrote a longer, more detailed letter is insufficient to meet the good cause requirement for consideration of new evidence. There is no reason a more elaborate opinion from Dr. Mendius could not have been introduced earlier. Plaintiff, who has had the benefit of being represented by counsel at all stages of her proceedings, has not demonstrated good cause for failing to do so.

### 4. THE ALJ ADEQUATELY DEVELOPED THE RECORD.

This order holds that the ALJ adequately developed the record with regard to plaintiff's headaches. During the hearing, he voiced his concerns that there was insufficient evidence in the administrative record and left the record open after the hearing at counsel's request. Dr. Mendius responded by confirming that plaintiff suffered from migraines and indicating that she was receiving medical treatment accordingly. Allowing for supplementation on the issue satisfied the ALJ's duty to conduct an appropriate inquiry into plaintiff's headaches. *Compare Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998). This order notes that because plaintiff was represented, the ALJ had no heightened duty to develop the record.

### 5. THE ALJ ADEQUATELY CONSIDERED ALL OF PLAINTIFF'S IMPAIRMENTS.

Plaintiff also argues that the ALJ failed to consider her headaches in determining her residual functional capacity. The Court is skeptical. First, the ALJ explicitly noted that he considered "all symptoms, including pain" in reaching his decision (AR 20). Second, to the extent that plaintiff concedes that the limitations caused by her post concussion syndrome were adequately considered, headache is one of the most common symptoms of this disorder. Third, to the extent that plaintiff suffered pain, the ALJ considered this and found that it was "not of a duration, frequency or intensity as to be disabling" (AR 24). Fourth, the ALJ observed that even if he were to give "maximum weight to her subjective allegations," he would have reached the

same conclusion that plaintiff was not disabled because she could perform at least sedentary work (AR 24).

### 6. THE ALJ DID NOT ERR IN DISCREDITING PLAINTIFF'S TESTIMONY.

Plaintiff further asserts that the ALJ improperly discredited her testimony. This is unpersuasive. The Court respects that ALJ is responsible for determining credibility of witnesses at the administrative hearing and resolving conflicts in the medical testimony. Substantial evidence supports the ALJ's conclusions that plaintiff's testimony was not credible and the cumulative effect of her symptoms was not disabling. Even if the evidence were susceptible to another rational interpretation, the Court would have to uphold the ALJ's decision. *Andrews*, 53 F.3d at 1039.

First, plaintiff and her mother both indicated that she was capable of performing all her chores and daily activities without assistance (AR 116-28). Second, she was prescribed a variety of medications to manage her pain. Third, plaintiff returned to her job at the DMV shortly after the ALJ's decision was rendered, which suggests a greater ability to work (at least part-time) than she was willing to acknowledge at the hearing. Finally, this order notes that if plaintiff's migraines had truly been her greatest concern, she presumably would have sought treatment for her headaches earlier, rather than focusing on treating her cognitive problems first, as she testified at the hearing (AR 294–95).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: July 15, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12